UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                             :

RABI ABDULLAHI, individually
and as the natural guardian         :      01 Civ. 8118 (WHP)
and personal representative of
the estate of her daughter          :      <u>MEMORANDUM AND ORDER</u>
Lubabatau Abdullahi, <u>et al.</u>,
                             :

          Plaintiffs,        :

        -against-           :

PFIZER, INC.,                   :

        Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          This putative class action stems from Plaintiffs' allegations that they suffered

grave injuries from an experimental antibiotic administered by defendant Pfizer, Inc. ("Pfizer" or

"Defendant") in Nigeria.  Plaintiffs bring their action under 28 U.S.C. § 1350, the Alien Tort

Statute (the "ATS"),[1] because Pfizer purportedly violated the Nuremberg Code, the Declaration

of Helsinki, article 7 of the International Covenant on Civil and Political Rights ("ICCPR"), FDA

regulations and other customary international law.

---

[1]  The Complaint refers to the ATS as the Alien Tort Claims Act ("ATCA").  Indeed, even courts
disagree over the statute's proper name.  <u>Compare</u> <u>Rasul v. Bush</u>, 542 U.S. 466, ---, 124 S. Ct.
2686, 2691 (2004) ("Alien Tort Statute") <u>with</u> <u>Flores v. S. Peru Copper Corp.</u>, --- F.3d ---, 2003
WL 24122601, at *1 (2d Cir. Aug. 29, 2003), <u>previously published as</u> 406 F.3d 65, <u>previously
published as</u> 343 F.3d 140 (2d Cir. 2003) ("Alien Tort Claims Act").  This Court refers to the
statute as the Alien Tort Statute, because it is purely jurisdictional in nature, and does not provide
a private cause of action.  <u>See</u> <u>Sosa v. Alvarez-Machain, et al.</u>, 542 U.S. 692, ---, 124 S. Ct.
2739, 2761 (2004).

On September 16, 2002, this Court dismissed this action on <u>forum non conveniens</u> grounds.  <u>Abdullahi v. Pfizer, Inc.</u>, No. 01 Civ. 8118 (WHP), 2002 WL 31082956 (S.D.N.Y. Sept. 17, 2002) ("<u>Abdullahi I</u>").  Thereafter, the Second Circuit remanded the action for consideration of the circumstances underlying dismissal of a related case in Nigeria, captioned <u>Zango v. Pfizer International, Inc.</u>, Case No. FHC/K/CS/204/2001 (the "<u>Zango</u> proceedings").  <u>Abdullahi v. Pfizer, Inc.</u>, No. 02-9223(L), 77 Fed. App'x 48, 53 (2d Cir. Oct. 8, 2003) ("<u>Abdullahi II</u>").  The parties submitted the record of the <u>Zango</u> proceedings for review in connection with the <u>forum non conveniens</u> analysis.  In addition, Pfizer moves to dismiss for lack of subject matter jurisdiction under the ATS.

As discussed below, this Court grants Pfizer's motion to dismiss.  In addition, this Court finds that the <u>Zango</u> proceedings do not preclude dismissal of this action for <u>forum non conveniens</u>.

BACKGROUND

I.  <u>Brief Overview of the Alleged Facts</u>

The factual background of this action is set forth in this Court's prior Memorandum and Order.  <u>See</u> <u>Abdullahi I</u>, 2002 WL 31082956, at *1-3.  Briefly stated, Plaintiffs are Nigerian minors and their guardians, residing in Nigeria.  <u>Abdullahi I</u>, 2002 WL 31082956, at *1.  The central events at issue in this lawsuit occurred in 1996, soon after epidemics of bacterial meningitis, measles and cholera broke out in Kano, Nigeria.  <u>Abdullahi I</u>, 2002 WL 31082956, at *1.  Pfizer established a treatment center at the Infectious Disease Hospital ("IDH") in Kano to treat meningitis victims.  <u>Abdullahi I</u>, 2002 WL 31082956, at *1.  Plaintiffs allege that instead of using safe and effective treatments, Pfizer embarked on a medical

experiment involving the "new, untested and unproven" antibiotic, trovaflozacin mesylate, better known by its brand name, Trovan® ("Trovan").  Abdullahi I, 2002 WL 31082956, at *1.

"Plaintiffs further contend that Pfizer's sole purpose for traveling to Kano was to expedite the FDA's approval of Trovan to treat pediatric victims."  Abdullahi I, 2002 WL 31082956, at *2.  Nigerian officials allocated two IDH wards to Pfizer for the testing.  Abdullahi I, 2002 WL 31082956, at *2.  Pfizer treated children ranging in age from one to thirteen years who exhibited symptoms of neck stiffness, joint stiffness and high fevers with headaches and divided them into two groups.  Abdullahi I, 2002 WL 31082956, at *2.  One group was treated with Trovan, while the other was "purposefully 'low-dosed'" with ceftriaxone, an FDA-approved drug shown to be effective in treating meningitis.  Abdullahi I, 2002 WL 31082956, at *2.  To enhance the comparative results of Trovan, Pfizer administered only a third of ceftriaxone's recommended dosage.  Abdullahi I, 2002 WL 31082956, at *2.

Plaintiffs contend that "Pfizer failed to explain to the children's parents that the proposed treatment was experimental, that they could refuse it, or that other organizations offered more conventional treatments at the same site free of charge."  Abdullahi I, 2002 WL 31082956, at *2.  After two weeks of testing, Pfizer's team left Kano and never returned for follow-up evaluations.  Abdullahi I, 2002 WL 31082956, at *2.  Five children who received Trovan and six children who were "low-dosed" with ceftriaxone died, while others suffered paralysis, deafness and blindness.  Abdullahi I, 2002 WL 31082956, at *2.

II.  Procedural History

On August 29, 2001, Plaintiffs, who are Nigerian residents, brought this action under the ATS to recover damages for Pfizer's alleged violations of international law, specifically, the Nuremberg Code, the Declaration of Helsinki, the guidelines authored by the Council for International Organizations of Medical Services ("CIOMS"), article 7 of the ICCPR, the Universal Declaration of Human Rights and FDA regulations.  (Complaint, dated Aug. 28, 2001 ("Compl.") ¶¶ 10, 15, 134, 228-50.)  Plaintiffs allege that despite knowing that Trovan could cause serious joint and liver damage, Pfizer failed to inform them of that risk or seek their informed consent, and neglected to evaluate the subjects subsequent to their treatment. (Compl. ¶¶ 135-40.)  Pfizer moved to dismiss the Complaint for forum non conveniens and failure to state a claim.  By Memorandum and Order dated September 16, 2002, this Court denied Pfizer's motion to dismiss for failure to state a claim but granted its motion to dismiss on forum non conveniens grounds.  Abdullahi I, 2002 WL 31082956, at *6, 12.  This Court found that the action should be litigated in Nigeria where the alleged incidents took place.  Abdullahi I, 2002 WL 31082956, at *12.  Plaintiffs appealed that ruling to the Court of Appeals.

On appeal, Plaintiffs asked the Second Circuit to take judicial notice of the fact that a parallel action filed in Nigeria, involving different plaintiffs but the same course of conduct by Pfizer, was voluntarily dismissed on August 19, 2002.[2]  Abdullahi II, 77 Fed. App'x at 52.  In particular, "Plaintiffs request[ed] that [the Second Circuit] notice both the fact of the dismissal 'and the reasons for it.'"  Abdullahi II, 77 Fed. App'x at 52.  Plaintiffs argued that the Zango plaintiffs' Notice of Discontinuance evidences their reasons for discontinuing the action: "The notice blames an indefinite adjournment and the fact that the judge hearing the case

declined jurisdiction 'for personal reasons.'"  Abdullahi II, 77 Fed. App'x at 52.

Pfizer objected to Plaintiffs' request, and asked that the Second Circuit take notice of "the entire Zango docket, minutes and rulings because, according to Pfizer, these entries, minutes and rulings show that the Zango plaintiffs' version of events (as outlined in the Notice of Discontinuance) is disingenuous."  Abdullahi II, 77 Fed. App'x at 52.

Because the parties' understanding of the Zango proceedings conflicted and the Zango record was not before this Court, the Second Circuit declined to take judicial notice of the matters requested by either side.  The Court of Appeals noted that "[t]hese facts . . . would seem to be relevant to the forum non conveniens analysis – perhaps providing just the type of specific information that the District Court found lacking," and "remand[ed] the case to the District Court for proceedings to determine what precipitated the dismissal in Zango and to evaluate whether that impacts the District Court's forum non conveniens analysis."  Abdullahi II, 77 Fed. App'x at 53.

On September 8, 2004, this Court held oral argument on the issue framed by the Court of Appeals.  At the oral argument, Pfizer sought permission to file a brief on the impact of the Supreme Court's ruling in Sosa v. Alvarez-Machain and the Second Circuit's ruling in Flores v. Southern Peru Copper Corporation in support of a new motion to dismiss for failure to state a claim under the ATS.  (Transcript of Oral Argument, dated Sept. 8, 2004 ("Tr.") at 28-30.)  To ensure "judicial economy," this Court agreed to consider the impact of Sosa and Flores on the instant action.  (Tr. at 29.)

---

[2]  While "[t]he Zango plaintiffs' Notice of Discontinuance was dated August 19, 2002, . . . it was not actually filed until October 17, 2002."  Abdullahi, 77 Fed. App'x at 52 n.2.

III.  Zango Proceedings

        The facts pertaining to the Zango proceedings are gleaned from the declarations of the parties' experts.  (See Affidavit of Lukman O. Ishola, dated June 3, 2003 ("Ishola Aff. I"); Affidavit of Lukman O. Ishola, dated May 7, 2004 ("Ishola Aff. II"); Declaration of Adetunji Oyeyipo, dated Apr. 29 2004 ("Oyeyipo Decl.").)

        On March 12, 2001, the Zango plaintiffs, represented by Lukman O. Ishola, brought their action in the Federal High Court in Kano, Nigeria, seeking "compensation for losses suffered and the death of some of the [Zango] [p]laintiffs as a result of the injuries sustained upon the administration of the drug Trovafloxacin (Trovan)."  (Ishola Aff. I ¶ 1, 3; see Ishola Aff. II ¶ 1; Oyeyipo Decl. ¶ 10.)  The Zango complaint alleged that there were 350 class members.  (Oyeyipo Decl. ¶ 10; Ishola Aff. II ¶ 3.)  In addition to Pfizer, the Zango plaintiffs named the Federal Ministry of Health, the Minister of Health, and the Attorney General and Minister of Justice of Nigeria (collectively, the "Government Defendants") as defendants.  (Oyeyipo Decl. ¶ 10; Oyeyipo Decl. Ex. A at 97-99.)

        The parties dispute whether the Kano action progressed in a timely manner.  For example, Plaintiffs contend that it "suffered 14 adjournments without appreciable progress" (Ishola Aff. I ¶ 5), while Pfizer contends that the Zango court "gave considerable attention to the matter, holding eight separate Court dates in the course of over a year, and more recently holding a ninth hearing approximately two months after a new judge was appointed."  (Oyeyipo Decl. ¶ 5; Oyeyipo Decl. Ex. A: Record of the Zango Proceedings.)  The Zango record indicates that some of the adjournments in that action resulted from failure of the Zango plaintiffs or their counsel to appear in court or from adjournments they requested.  (See, e.g., Oyeyipo Decl. Ex. A at 175 (plaintiffs' counsel not present), 175-76 (plaintiffs' counsel seeks adjournment), 187

6

(plaintiffs' counsel seeks adjournment).)

Additionally, the <u>Zango</u> plaintiffs appear to have pursued litigation strategies that further delayed the proceedings.  For example, in their Answer, the Nigerian Government defendants argued that the Public Officers Protection Act Cap 379 Law of the Federation of Nigeria 1990 barred the suit against them.  (Oyeyipo Decl. Ex. A at 95.)  In response, the <u>Zango</u> plaintiffs requested "a short date to allow [its counsel] to react and argue the objection" of the Government Defendants.  (Oyeyipo Decl. Ex. A at 176.)  The case was adjourned to July 3, 2001.  (Oyeyipo Decl. Ex. A at 176.)  On July 3, 2001, instead of addressing the merits of the Government Defendants' opposition, the <u>Zango</u> plaintiffs objected that the Government Defendants had not filed "a memo of appearance in this matter" and urged that the defense be "struck out." (Oyeyipo Decl. Ex. A at 176.)  Pfizer's counsel responded that "one would have expected [the <u>Zango</u> plaintiffs] to overlook any [technical] irregularity so as to give [their] suit a speedy trial," and "urge[d] the court to over rule the objection of [the <u>Zango</u> plaintiffs] and to allow parties to address the Court on the issue of preliminary objection filed by the [Government] Defendants." (Oyeyipo Decl. Ex. A at 180.)  While the court declined the <u>Zango</u> plaintiffs' request to strike the defense, it adjourned the proceeding to allow the Government Defendants' counsel an opportunity to "apply formally to regularize his position in th[e] matter." (Oyeyipo Decl. Ex. A at 181-82.)  On September 24, 2001, instead of responding to the Government Defendants' defense, the <u>Zango</u> plaintiffs asked the court to "strike out" their action against the Government Defendants.  (Oyeyipo Decl. Ex. A at 183.)  Because there was no objection, the court dismissed the action against the Government Defendants but ordered the <u>Zango</u> plaintiffs to pay N3,000 (three thousand naira) in costs.  (Oyeyipo Decl. Ex. A at 184-85.)

On November 5, 2001, the <u>Zango</u> plaintiffs sought leave to amend their statement

of claim and the court granted the request.  (Oyeyipo Decl. Ex. A at 186-87.)  However, the

Zango plaintiffs did not file an amended statement of claim.  There is also evidence that the

Zango plaintiffs repeatedly failed to adequately respond to Pfizer's requests for particulars.

(Oyeyipo Decl. Ex. A at 112-13, 153-64, 187, 189-90.)

    Plaintiffs argue that Pfizer bears responsibility for delays in the Zango

proceeding.  (Ishola Aff. I ¶¶ 6-7.)  In particular, Ishola contends that Pfizer "filed an application

for the supply of further and better particulars on August 6, 2001 and I verily believe that learned

Counsel deliberately left it in abeyance for argument until June 6, 2002."  (Ishola Aff. I ¶ 6.)

Ishola further states that he "verily believe[s] that [Pfizer's] Counsel, Messrs Rotimi Ogunesho

and Tunji Oyeyipo who usually appeared in court were never ready to argue the motion filed on

August 6, 2001 for 11 months after filing the application until the [Pfizer's] leading counsel

learned Senior Advocate of Nigeria, Alhaji Abdullahi Ibrahim deemed it fit to appear for the first

time since the commencement of the Suit on 12th March, 2001 and argue[]" the motion.  (Ishola

Aff. I ¶ 7.)  However, both assertions, admittedly Ishola's "beliefs," are unsupported by evidence.

    There is no dispute that some of the delay in the Zango proceedings resulted from

the Nigerian judiciary.  For example, on July 30, 2001, the case was adjourned until September

24, 2001 because Judge Nwaogwugwu, the assigned judge, was unavailable for personal reasons.

(Oyeyipo Decl. ¶ 25 & Ex. A at 183.)  Later, in November 2001, Judge Nwaoagwugwu was

removed from the bench because he had "assumed jurisdiction over a[n unrelated] case that he

did not have the authority to adjudicate over."  (Oyeyipo Decl. ¶ 43; see also Letter to the Court

from Elaine S. Kusel, dated May 7, 2004 ("Kusel Letter") at 4.)  Subsequently, on April 22,

2002, Judge Hobon was assigned the Zango action.  (Oyeyipo Decl. Ex. A at 188; see also Kusel

Letter at 4.)  Less than three months later, Judge Hobon declined jurisdiction over the action for

"reasons personal" to him and transferred the action back to "Court I" where the action had originated.  (Oyeyipo Decl. Ex. B: Ruling By Judge Hobon, dated July 4, 2002 at 8.)

On August 19, 2002, after Judge Hobon's recusal, the <u>Zango</u> plaintiffs prepared a Notice of Discontinuance, but did not file it with the High Court until October 17, 2002. (Oyeyipo Decl. Ex. A at 170; <u>see also</u> Ishola Aff. I ¶ 16; Ishola Aff. II ¶ 10.)  The <u>Zango</u> plaintiffs noted:

> The Plaintiffs hereby wholly discontinue this action against the Defendants.
>
> This notice is premised on the fact that the case has been adjourned indefinitely since the 4th of July 2002 by Hon. Justice Haroun Adamu of the Federal High Court 2, Kano having declined jurisdiction in this matter for personal reasons.

(Oyeyipo Decl. Ex. A at 170.)

IV.  <u>Allegations of Corruption</u>

Plaintiffs contend that the <u>Zango</u> plaintiffs filed their Notice of Dismissal because after Judge Hobon's recusal no new judge was appointed in Kano.  (Ishola Aff. II ¶ 10.)  While Plaintiffs concede that "[i]t may be impossible to know with certainty what 'personal' reasons induced Justice Hobon to decline jurisdiction over the <u>Zango</u> case," they suggest that "corruption and bias in the Nigerian judiciary" played a role in the <u>Zango</u> plaintiffs' filing of their Notice of Dismissal.  (Kusel Letter at 3-5.)  However, Plaintiffs' contention is unsupported by any evidence.  Indeed, Ishola does not contend that "corruption and bias in the Nigerian judiciary" played any role in his decision to file the Notice of Dismissal, but instead credits delay in the <u>Zango</u> proceedings.  (Ishola Aff. II ¶ 10.)

Relying upon its submission in opposition to Pfizer's original motion to dismiss, Plaintiffs paint a picture of the Nigerian judiciary as corrupt and biased.  (Kusel Letter at 3.)

Plaintiffs further contend that "judges have been known to withdraw from cases for personal reasons when they are being subject to undue pressure or harassment to rule in a particular direction."  (Kusel Letter at 4.)  Plaintiffs also contend that Pfizer engaged in "bribery of judicial or law enforcement officials":

> [W]hen Pfizer conducted the Trovan testing in Kano, a Pfizer employee in Kano, Mike Dunn, suddenly contacted Pfizer headquarters and informed Dr. Scott Hopkins's secretary that the Nigerian government had halted the testing.  According to Dr. [Juan] Walterspiel, Dunn stated that it was imperative that Pfizer immediately supply him with cash, or else he and other members of the Pfizer team would go to jail.  Ultimately, no Pfizer employees were jailed and the tests continued.

(Kusel Letter at 4 (internal citations omitted).)  Plaintiffs argue that these facts provide "strong circumstantial evidence that Justice Hobon declined jurisdiction because he was subject to improper or undue pressure, perhaps from Pfizer itself, or from government officials friendly with Pfizer who had been involved with the Trovan tests."  (Kusel Letter at 4-5.)

## DISCUSSION

### I.  Rule 12(b)(6) Standard

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995).  Although on a motion to dismiss a court is generally limited to examining the sufficiency of the pleadings, where, as here, a challenge is directed at the court's subject

matter jurisdiction, the court may examine materials outside the complaint to resolve

jurisdictional issues.  See Flores, 2003 WL 24122601, at *18 n.30; Filetech S.A. v. France

Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); In re South African Apartheid Litig., 346 F.

Supp. 2d 538, 546 (S.D.N.Y. 2004).


## II.  Claims Under the ATS

Plaintiffs rely on the Nuremberg Code, the Declaration of Helsinki, article 7 of

the ICCPR and "other norms of international law" to frame their complaint.  (Compl. ¶¶ 10, 15,

134.)  In particular, Plaintiffs allege:  "Foremost among Pfizer's violations was its failure to get

any consent, informed or otherwise, before performing medical experiments on the subject

children, in contravention of customary international law and as specifically forbidden by the

Nuremberg Code, the Declaration of Helsinki, and the [ICCPR]."  (Compl. ¶ 10.)  In Abdullahi I,

because the parties had not argued "whether the [alleged] conduct qualifies as a violation of

'customary international law' under the [ATS]," this Court did not address that issue.  Abdullahi

II, 77 Fed. App'x at 53.

Pfizer presently moves to dismiss for failure to state a claim and lack of subject

matter jurisdiction in light of "recent Supreme Court and Second Circuit decisions that sharply

curtail claims under the Alien Tort Statute."  (Pfizer's Memorandum in Support of its Motion to

Dismiss, dated Oct. 1, 2004 ("Pfizer's Supp. Mem.") at 1 (citing Sosa, 542 U.S. 692, 124 S. Ct.

2739; Flores, 2003 WL 24122601).[3])  Although this Court could bypass the question of

jurisdiction and dismiss the action solely on forum non conveniens grounds, see Monegasque De

Reassurances S.A.M. v. Nak Naftogaz of Ukr., 311 F.3d 488, 497-98 (2d Cir. 2002), for the sake

---

[3]  While Flores preceded the Supreme Court's Sosa decision, its rationale conforms with Sosa's.

of "judicial economy" this Court considers whether it has subject matter jurisdiction under the ATS.  (Tr. at 29.)

     A.  <u>The Alien Tort Statute</u>

          Adopted in 1789 by the first Congress, the ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350; <u>see also</u> <u>Flores</u>, 2003 WL 24122601, at *6.  Here, Plaintiffs are aliens who allege tort causes of action. Thus, for federal subject matter jurisdiction to exist under the ATS, the complaint must adequately plead a violation of international law.  <u>See</u> <u>Kadic v. Karadzic</u>, 70 F.3d 232, 238 (2d Cir. 1995) ("Because the [ATS] requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of section 1331 [federal question jurisdiction]."  (quoting <u>Filartiga v. Pena-Irala</u>, 630 F.2d 876, 887-88 (2d Cir. 1980))); <u>see also</u> <u>Bigio v. Coca-Cola Co.</u>, 239 F.3d 440, 447 (2d Cir. 2000) (under the ATS, pleading a violation of the law of nations is a jurisdictional prerequisite).

          "The [ATS] permits an alien to assert a cause of action in tort for violations of a treaty of the United States and for violations of the law of nations, which . . . refers to the body of law known as customary international law."  <u>Flores</u>, 2003 WL 24122601, at *11 (internal quotation marks omitted).  Prior to <u>Sosa</u>, a number of courts–though not all–had held that the ATS created a cause of action.  <u>See</u> <u>Flores</u>, 2003 WL 24122601, at *7 ("[T]he <u>Filartiga</u> Court not only held that the [ATS] provides a jurisdictional basis for suit, but also recognized the existence of a private right of action <u>for aliens only</u> seeking to remedy violations of customary

international law." (emphasis in original)); <u>Abebe-Jira v. Negewo</u>, 72 F.3d 844, 847 (11th Cir. 1996) ("We read the [ATS] as requiring no more than an allegation of a violation of the law of nations in order to invoke section 1350."); <u>In re Estate of Ferdinand Marcos, Human Rights Litig.</u>, 25 F.3d 1467, 1475-76 (9th Cir. 1994) ("<u>Marcos</u>") (the ATS "creates a cause of action" and "nothing more than a <u>violation</u> of the law of nations is required to invoke section 1350" (internal quotation marks omitted)). <u>Cf.</u> <u>Tel-Oren v. Libyan Arab Republic</u>, 726 F.2d 774, 798 (D.C. Cir. 1984) (Bork, J., concurring) (noting that the ATS provides only subject matter jurisdiction–it does not create a cause of action); <u>see also</u> <u>Al Odah v. United States</u>, 321 F.3d 1134, 1146 (D.C. Cir. 2003) (Randolph, J., concurring).  The Supreme Court addressed this dispute in <u>Sosa</u>, 542 U.S. 692, 124 S. Ct. 2739.

B.  <u>The Sosa Case</u>

In <u>Sosa</u>, the plaintiff, Humberto Alvarez-Machain ("Alvarez"), a Mexican citizen, was indicted by a federal grand jury for the murder of a U.S. Drug Enforcement Agency ("DEA") agent in Mexico, and a federal court issued a warrant for his arrest.  <u>Sosa</u>, 124 S. Ct. at 2746.  "[T]he DEA approved a plan to hire Mexican nationals to seize Alvarez and bring him to the United States for trial."  <u>Sosa</u>, 124 S. Ct. at 2746.  "[A] group of Mexicans, including petitioner Jose Francisco Sosa, abducted Alvarez from his house, held him overnight in a motel, and brought him by private plane to El Paso, Texas, where he was arrested by federal officers."  <u>Sosa</u>, 124 S. Ct. at 2746.  Alvarez was then prosecuted and acquitted of the crime.  <u>Sosa</u>, 124 S. Ct. at 2746.

After returning to Mexico, Alvarez filed suit in the Central District of California against Sosa and others under the Federal Tort Claims Act, 28 U.S.C. § 2674, and the ATS "for

a violation of the law of nations." Sosa, 124 S. Ct. at 2747.  Sosa contended that the ATS claim should be dismissed because the statute only provided federal courts with jurisdiction, and not a right of action without further congressional approval.  Alvarez countered that the ATS authorizes creation of a new cause of action for torts that violate international law.

The Supreme Court, however, found Alvarez's reading "implausible" and held that the ATS was jurisdictional "in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." Sosa, 124 S. Ct. at 2755.  That is, the Court held that the ATS creates no new causes of action but confers on federal courts the power to hear a narrow set of alien tort claims for violations of international law.  Sosa, 124 S. Ct. at 2755 (noting that because the ATS was placed in Section 9 of the Judiciary Act, "a statute otherwise exclusively concerned with federal-court jurisdiction," the ATS confers jurisdiction without itself creating a new cause of action).

Notwithstanding its holding, the Court left the door "ajar" to some international human rights litigation in federal courts, "subject to vigilant doorkeeping" by the courts.  Sosa, 124 S. Ct. at 2764.  The Court noted that courts may recognize new actionable rules based on evolving principles of international law.  Sosa, 124 S. Ct. at 2764.  However, federal courts "should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms." Sosa, 124 S. Ct. at 2761-62.  The Court provided context to the types of actions it had in mind by listing the three causes of action recognized under federal common law at the time the ATS was enacted:  offenses against ambassadors; violations of safe conduct; and individual actions for piracy.  Sosa, 124 S. Ct. at 2758-59, 2761.  Thus, "federal courts should not recognize private claims under federal common law for

violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." Sosa, 124 S. Ct. at 2765 (citing United States v. Smith, 18 U.S. (5 Wheat.) 153, 163-180, n.a (1820)).

Applying its holding to the facts of the case, the Court found that Alvarez's brief detention, transfer to custody of American authorities and prompt arraignment did not violate any norm of customary international law "so well defined as to support the creation of a federal remedy." Sosa, 124 S. Ct. at 2769. To hold otherwise, the Court noted, "would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place." Sosa, 124 S. Ct. at 2768.

C.  Application of Sosa to This Case

Plaintiffs bring this action pursuant to the ATS to recover damages for Pfizer's alleged violations of international law. (Compl. ¶¶ 10, 15, 134, 228-50.) Aware that Trovan had the potential to cause serious joint and liver damage, plaintiffs allege that Pfizer failed to inform them of that risk or seek their informed consent, and treated them but neglected to evaluate them after their treatment. (Compl. ¶¶ 135-40.) While this Court may disapprove of Pfizer's actions, it must apply established law–"not some normative or moral ideal." In re South African Apartheid Litig., 346 F. Supp. 2d at 548 (citing Planned Parenthood v. Casey, 505 U.S. 833, 850 (1992) (joint opinion) ("Our obligation is to define the liberty of all, not to mandate our own moral code.")).

Plaintiffs correctly state that non-consensual medical experimentation violates the law of nations and, therefore, the laws of the United States. See The Paquete Habana, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered

by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); United States v. Brandt, (The Medical Case), 2 Trials of War Criminals Before the Nuremberg Tribunals Under Control of Council Law No. 10, at 181 (1949) (elaborating on the Nuremberg Code, which prohibits non-consensual medical experimentation).  However, the law of nations does not itself create a right of action because it does not require any particular reaction to violations of law, and therefore whether and how the United States reacts to such violations are domestic questions.  See Marcos, 25 F.3d at 1475 (internal quotation marks omitted); see also Sosa, 124 S. Ct. at 2754-55; Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) ("The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations.").

　　　　　While federal courts have the authority to imply the existence of a private right of action for violations of jus cogens norms of international law, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 392 (1971); see Sosa, 124 S. Ct. at 2744, federal courts must consider whether there exist "special factors counseling hesitation in the absence of affirmative action by Congress," Bivens, 403 U.S. at 396; see Sosa, 124 S. Ct. at 2763.  "The determination of what offenses violate customary international law . . . is no simple task."  Flores, 2003 WL 24122601, at *11.  Nonetheless, "[t]he law of nations 'may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'"  Filartiga, 630 F.2d at 880 (quoting Smith, 18 U.S. (5 Wheat.) at 160-61); see also United States v. Yousef, 327 F.3d 56, 103 (2d Cir. 2003) ("[W]e look primarily to the formal lawmaking and official actions of States and only secondarily to the works of scholars as evidence of the

established practice of States.").  However, "in determining what offenses violate customary

international law, courts must proceed with extraordinary care and restraint."  Flores, 2003 WL

24122601, at *11; Sosa, 124 S. Ct. at 2763.

        "[C]ustomary international law is composed only of those rules that States

universally abide by, or accede to, out of a sense of legal obligation and mutual concern."

Flores, 2003 WL 24122601, at *11; see also Sosa, 124 S. Ct. at 2767.  In contrast, "[p]ractices

adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise

to rules of customary international law."  Flores, 2003 WL 24122601, at *12.  "[C]ustomary

international law addresses only those 'wrongs' that are 'of mutual, and not merely several,

concern' to States."  Flores, 2003 WL 24122601, at *12 (quoting Filartiga, 630 F.2d at 888

(internal alterations omitted)).  Matters of "mutual" concern between States involve States'

actions performed towards or with regard to the other.  Flores, 2003 WL 24122601, at *12.  On

the other hand, matters of "several" concern among States are those in which States are

separately and independently interested.  Flores, 2003 WL 24122601, at *12.  Further, "[e]ven if

certain conduct is universally proscribed by States in their domestic law, that fact is not

necessarily significant or relevant for purposes of customary international law."  Flores, 2003

WL 24122601, at *12-13.  Indeed,

> the mere fact that every nation's municipal law may prohibit theft
> does not incorporate "the Eighth Commandment, 'Thou Shalt not
> steal' . . . (into) the law of nations." It is only where the nations of
> the world have demonstrated that the wrong is of mutual, and not
> merely several, concern, by means of express international
> accords, that a wrong generally recognized becomes an
> international law violation within the meaning of the statute.

Filartiga, 630 F.2d at 888 (quoting IIT v. Vencap, 519 F.2d 1001, 1015 (2d Cir. 1975)).

        Here, the key question is whether this Court should infer the existence of a private

right of action for the alleged violations of international law.  In Sosa, the Supreme Court

discussed "[a] series of reasons [that] argue for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the early statute."  Sosa, 124 S. Ct. at 2761-62.  First, the prevailing conception of common law has changed since the ATS was enacted in 1789.  While common law was once considered a "transcendental body of law" awaiting discovery, it is now understood that common law "is not so much found or discovered as it is either made or created" by the courts.  Sosa, 124 S. Ct. at 2762.  Second, federal common law requires federal courts to "look for legislative guidance before exercising innovative authority over substantive law."  Sosa, 124 S. Ct. at 2762.  Third, the creation of a private right of action should be left to the legislature.  Sosa, 124 S. Ct. at 2762-63.  Fourth, "the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."  Sosa, 124 S. Ct. at 2763.  Finally, courts have no congressional mandate to "seek out and define new and debatable violations of the law of nations."  Sosa, 124 S. Ct. at 2763.

      An action lies under the ATS "only for violations of treaties or customary international law."  Flores, 2003 WL 24122601, at *16; see Sosa, 124 S. Ct. at 2761-62.  To state a claim under the ATS, a plaintiff must allege violation of a "clear and unambiguous" rule of customary international law.  Filartiga, 630 F.2d at 884 (holding that because the prohibition on official torture is "clear and unambiguous," it can serve as a basis for suit under the ATS).  As noted, Plaintiffs allege that their claims under the ATS are supported by international law as set forth in the Nuremberg Code, the Declaration of Helsinki, guidelines authored by the CIOMS, article 7 of the ICCPR and the Universal Declaration of Human Rights.  (Compl. ¶¶ 10, 15, 134,

228-50.)  The sources of international law Plaintiffs rely on do not support jurisdiction under the ATS.

First, Plaintiffs contend that Pfizer's alleged actions violated the Nuremberg Code, which "sets forth the international standards of conduct governing biomedical research on human subjects."  (Compl. ¶ 55; see also Compl. ¶¶ 10, 15.)  The Nuremberg Code, however, does not give rise to a private right of action.[4]  See In re South African Apartheid Litig., 346 F. Supp. 2d at 550; Ammend v. BioPort, Inc., 322 F. Supp. 2d 848, 872 (W.D. Mich. 2004) ("This Court agrees with other jurisdictions which have found that there is no private right of action for an alleged violation of international law for the protection of human research subjects under . . . the Nuremberg Code."); Robertson ex rel. Robertson v. McGee, No. 01 CV 60, 2002 WL 535045, at *3 (N.D. Okla. Jan. 28, 2002).  Further, the United States has not ratified or adopted the Nuremberg Code.  See Grimes v. Kennedy Krieger Inst., 366 Md. 29, 99 n.39, 782 A.2d 807, 849 n.39 (2001) ("[T]he Nuremberg Code . . . [has] never been formally adopted by the relevant governmental entities."); see also Ammend, 322 F. Supp. 2d at 872 ("No Supreme Court decision . . . has adopted the Nuremberg Code as constitutional law").  In fact, the Nuremberg Code has not been adopted by the international community, see George J. Annas & Michael A. Grodin, Medical Ethics and Human Rights: Legacies of Nuremberg, 3 Hofstra L. & Pol'y Symp. 111, 113-14 (1999) ("[T]he Nuremberg Code has never been formally adopted as a whole by the United Nations."); Evelyne Shuster, Fifty Years Later: The Significance of the Nuremberg Code, 337 N. Eng. J. Med. 1436, 1439 (1997) ("The Nuremberg Code has not been officially adopted in its entirety as law by any nation or as ethics by any major medical association."), evidencing

---

[4]  Similarly, the FDA regulations do not provide any private right of action.  See Summit Tech., Inc. v. High-Line Med. Instruments Co., 933 F. Supp. 918, 932-33 (C.D. Cal. 1996); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1113 (2d Cir. 1997).

that the Nuremberg Code "has not even been universally embraced by all of the prominent

States."  Flores, 2003 WL 24122601, at *19.  Accordingly, this Court declines to find the

Nuremberg Code a binding source of international law giving rise to a private cause of action

under the ATS.  See Ammend, 322 F. Supp. 2d at 872; see also Heinrich ex rel. Heinrich v.

Sweet, 49 F. Supp. 2d 27, 43 (D. Mass. 1999).

       Plaintiffs further contend that Pfizer's alleged actions violated the Declaration of

Helsinki of the World Medical Association and the CIOMS Guidelines.  (Compl. ¶¶ 10, 15, 62,

64.)  However, "the Helsinki Accord does not create a private right of action in U.S. federal

courts and do[es] not have the force of law."  Hoover v. W. Va. Dep't. of Health & Human Res.,

984 F. Supp. 978, 980 (S.D. W.Va.), aff'd, 129 F.3d 1259 (4th Cir. 1997); see also Ammend, 322

F. Supp. 2d at 872 ("This Court agrees with other jurisdictions which have found that there is no

private right of action for an alleged violation of international law for the protection of human

research subjects under the Declaration of Helsinki."); Robertson, 2002 WL 535045, at *3.  The

Declaration of Helsinki, authored by the World Medical Association, is a "mere general

statement of policy that is unlikely to give rise to obligations in any strict sense."  Flores, 2003

WL 24122601, at *23 (internal quotation marks omitted).  Indeed,

> a court is not granted a roving commission to pick and choose
> among declarations of public and private international
> organizations that have articulated a view on the matter at hand.
> Such declarations are almost invariably political statements–
> expressing the sensibilities and the asserted aspirations and
> demands of some countries or organizations–rather than statements
> of universally-recognized legal obligations.  Accordingly, such
> declarations are not proper evidence of customary international
> law.

Flores, 2003 WL 24122601, at *23; see also United States v. Yousef, 327 F.3d 56, 102-03 (2d

Cir. 2003) ("In a system governed by the rule of law, no private person–or group of men and

women such as comprise the body of international law scholars–creates the law.  Accordingly,

instead of relying primarily on the works of scholars for a statement of customary international law, we look primarily to the formal lawmaking and official actions of States and only secondarily to the works of scholars as evidence of the established practice of States."); Beanal v. Freeport-McMoran, Inc., 197 F.3d 161, 167-68 (5th Cir. 1999).  Similarly, the CIOMS Guidelines are authored by "an international, non-governmental, non-profit organization," see What is CIOMS?, http://www.cioms.ch/what_is_cioms.htm, and, therefore, fail to give rise to obligations in any strict sense.  See Flores, 2003 WL 24122601, at *23-24; Yousef, 327 F.3d at 102-03; Beanal, 197 F.3d at 167-68.  Further, like the Declaration of Helsinki, the broad aspirational language of the CIOMS Guidelines do not contain the specificity required under the ATS.  See Sosa, 124 S. Ct. at 2761-62; Flores, 2003 WL 24122601, at *17 ("[I]n order to state a claim under the ATCA, we have required that a plaintiff allege a violation of a clear and unambiguous rule of customary international law." (internal quotation marks omitted)); Beanal, 197 F.3d at 167 (stating that customary international law cannot be established by reference to "abstract rights and liberties devoid of articulable or discernable standards and regulations"); Marcos, 25 F.3d at 1475 (stating that a rule of customary international law must be "specific, universal, and obligatory").  Finally, like the Declaration of Helsinki, the CIOMS Guidelines does not create any legal obligations or binding rules that can be applied.  See Sosa, 124 S. Ct. at 2767.

Plaintiffs also assert that Pfizer's failure to "get any consent, informed or otherwise, before performing medical experiments on the subject children" violates Article 7 of the ICCPR.  (Compl. ¶ 10.)  "[A]lthough the [ICCPR] does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it

was not self-executing[5] and so did not itself create obligations enforceable in the federal courts."
Sosa, 124 S. Ct. at 2767.  Indeed, "the Senate has expressly declined to give the federal courts
the task of interpreting and applying international human rights law, as when its ratification of
the [ICCPR] declared that the substantive provisions of the document were not self-executing."
Sosa, 124 S. Ct. at 2763.  Thus, Plaintiffs "cannot say that the . . . [ICCPR] establish[es] the
relevant and applicable rule of international law."  Sosa, 124 S. Ct. at 2767; see also In re South
African Apartheid Litig., 346 F. Supp. 2d at 552-53; Heinrich, 49 F. Supp. 2d at 43 ("Because
the United States Senate and all the courts to consider the issue have held that the Covenant is
not self-executing and a private right of action should not be implied, the Plaintiffs have no
recognized cause of action for civil responsibility for crimes against humanity."); White v.
Paulesen, 997 F. Supp. 1380, 1386-87 (E.D. Wash. 1998) (finding that because the ICCPR was
not self-executing, it did not give rise to a private right of action).  Further, the ICCPR's vague
language makes it difficult to "define or identify conduct that constitutes a violation of
international law."  Beanal, 197 F.3d at 168.

      Finally, Plaintiffs rely upon the Universal Declaration of Human Rights.  (Compl.
¶¶ 246, 248.)  "But the Declaration does not of its own force impose obligations as a matter of
international law," and Plaintiffs cannot say that it "establish[es] the relevant and applicable rule
of international law."  Sosa, 124 S. Ct. at 2767.  Like the Declaration of Helsinki and the CIOMS
Guidelines, the Universal Declaration of Human Rights is "not [a] proper source[] of customary
international law because [it is] merely aspirational and [was] never intended to be binding on
member States of the United Nations."  Flores, 2003 WL 24122601, at *21.  Further, its language
"is simply not specific enough to create binding legal rules."  In re South African Apartheid

---

[5] An act is self-executing if it is effective immediately without requiring additional action,

Litig., 346 F. Supp. 2d at 553 (citing Flores, 2003 WL 24122601, at *24-25 (finding that

Universal Declaration's language regarding rights to health and life are too indefinite and express

"virtuous goals" only)).

Because "a decision to create a private right of action is one better left to

legislative judgment in the great majority of cases," Sosa, 124 S. Ct. at 2762-63, this Court will

not judicially forge broad aspirational language into customary international law.  As Judge

Sprizzo poignantly noted:

> Besides the obvious difficulty of enforcing a principle that is so
> purposefully general in order that the greatest number of countries
> can agree while still disagreeing on the particulars of how to
> implement the goal, see Flores, 343 F.3d at 161, there is also the
> great problem that international agreements often set patently
> unattainable goals that cannot reasonably be considered legal
> obligations of those countries that hope to one day fulfill those
> aspirations.  See, e.g., Kellogg-Briand Pact of 1928, 46 Stat. 2343
> (1928) (renouncing war as an instrument of national policy and
> proclaiming that disputes will only be resolved by peaceful
> means).

In re South African Apartheid Litig., 346 F. Supp. 2d at 553 n.17.  Indeed, "[w]hile the absence

of congressional action addressing private rights of action under an international norm is more

equivocal than its failure to provide such a right when it creates a statute, the possible collateral

consequences of making international rules privately actionable argue for judicial caution."

Sosa, 124 S. Ct. at 2763.  As the Supreme Court cautioned,

> Whatever may be said for the broad principle [plaintiffs]
> advance[], in the present, imperfect world, it expresses an
> aspiration that exceeds any binding customary rule having the
> specificity we require.  Creating a private cause of action to further
> that aspiration would go beyond any residual common law
> discretion we think it appropriate to exercise.

---

legislation or legal steps.

Sosa, 124 S. Ct. at 2769; see also In re South African Apartheid Litig., 346 F. Supp. 2d at 554.

A cause of action for Pfizer's "failure to get any consent, informed or otherwise, before

performing medical experiments on the subject children" would expand customary international

law far beyond that contemplated by the ATS.  Sosa, 124 S. Ct. at 2761-62; see White, 997 F.

Supp. at 1385 n.2 ("[T]his case appears to involve a situation where the principal substantive

issue is whether Plaintiffs' consent to participate in the underlying experiments should be

considered informed and voluntary. . . .  Thus, this Court would be required to determine exactly

what international law requires in the way of informed consent in this particular set of

circumstances, an issue that is not directly addressed by any of the international law authorities

cited by the parties.").

        Accordingly, this Court finds that none of the sources of international law on

which Plaintiffs advance provide a proper predicate for jurisdiction under the ATS.


III.  Forum Non Conveniens

        "Forum non conveniens is a discretionary device permitting a court in rare

instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over

the claim.'"  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000) (quoting PT

United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73 (2d Cir. 1998)).  The forum non

conveniens analysis has two prongs.  First, the defendant must demonstrate that an adequate

alternative forum exists.  Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996); see

also Calavo Growers of Calif. v. Generali Belgium, 632 F.2d 963, 968 (2d Cir. 1980) (forum non

conveniens "presupposes that an alternative forum is available").  If an adequate alternate forum

is available, the court then considers the public and private interest factors set forth in Gulf Oil

Corporation v. Gilbert, 330 U.S. 501, 508-09 (1947), and its progeny.  See Bank of Credit &

Commerce Int'l (Overseas) Ltd. v. State Bank of Pak., 273 F.3d 241, 246 (2d Cir. 2002); Wiwa,

226 F.3d at 100.  From those factors, a court must determine whether a trial in the plaintiff's

chosen forum would either create "oppressiveness and vexation to a defendant . . . out of all

proportion to plaintiff's convenience," or whether the "chosen forum [is] inappropriate because

of considerations affecting the court's own administrative and legal problems."  Piper Aircraft v.

Reyno, 454 U.S. 235, 241 (1981) (internal quotation marks omitted).  After considering the

"private interest factors" concerning the convenience of the litigants, and "public interest factors"

affecting the convenience of the forum, a "court may, in the exercise of its sound discretion,

dismiss the case."  Piper Aircraft, 454 U.S. at 241.

   The Second Circuit remanded this action on the question of whether Nigeria is an

"adequate alternative forum" in light of the Zango proceedings.  Accordingly, this Court limits

its forum non conveniens analysis to the adequacy inquiry.


 A.  Adequate Alternative Form

   Pfizer asserts that Kano's Federal High Court is an adequate alternative forum for

Plaintiffs' claims.  Plaintiffs counter that Kano's Federal High Court lacks adequate procedural

safeguards and that the Nigerian judiciary is known for rampant corruption and bias.

   The requirement of an adequate alternative forum "[o]rdinarily . . . will be

satisfied when the defendant is 'amenable to process' in the other jurisdiction."  Piper Aircraft,

454 U.S. at 255 n.22 (quoting Gilbert, 330 U.S. at 506-07).  Further, "[a]n agreement by the

defendant to submit to the jurisdiction of the foreign forum can generally satisfy this

requirement."  DiRienzo v. Philip Servs. Corp., 232 F.3d 49, 57 (2d Cir. 2000), vacated on other

grounds, 294 F.3d 21 (2d Cir. 2002); accord Aguinda v. Texaco, Inc., 303 F.3d 470, 476-77 (2d

Cir. 2002); Albert Trading, Inc. v. Kipling Belg. N.V./S.A., No. 00 Civ. 0478 (RMB), 2002 WL

272408, at *3 (S.D.N.Y. Feb. 26, 2002).  Here, Pfizer has agreed to (i) litigate these claims (or

their Nigerian equivalents) in Nigeria, (ii) accept service of process in Nigeria, and (iii) waive

any res judicata and statute of limitations-based defenses that may have matured since the filing

of the instant Complaints.  (Transcript of Oral Argument, dated Sept. 8, 2004 ("Tr.") at 17.)  See

also Abdullahi I, 2002 WL 31082956, at *7.  Further, "Nigerian law provides an alternative basis

for recovery even if it does not recognize the specific claims plaintiffs allege in this action."

Abdullahi I, 2002 WL 31082956, at *7; see PT United Can Co., 138 F.3d at 74.

"In rare circumstances . . . where the remedy offered by the other forum is clearly

unsatisfactory, the other forum may not be an adequate alternative."  Piper Aircraft, 454 U.S. at

254 n.22; see also Eastman Kodak Co. v. Kaviln, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) ("the

'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly

impressive track record").  Here, citing to State Department reports, newspaper articles and

proceedings from an unrelated case, Plaintiffs argue that Nigerian judiciary is too corrupt and

biased to be considered an adequate alternative forum.  (Kusel Letter at 3; Declaration of Elaine

S. Kusel, dated June 14, 2005 Exs. 2-3: Newspaper articles; Ishola Aff. II Ex. D: Proceedings

from an unrelated case).)  This Court disagrees.

In its prior decision, this Court rejected Plaintiffs' generalized allegations of

corruption and bias.  See Abdullahi I, 2002 WL 31082956, at *9-10; see also Leon v. Million

Air, Inc., 251 F.3d 1305, 1312 (11th Cir. 2001) (finding insufficient plaintiffs' affidavits

documenting the shortcomings of Ecuador's legal system, including a lack of financial resources,

the use of manual typewriters in 90 percent of the courts, the absence of computers in the trial

courts, and congestion and delays illustrated by case filings of one thousand lawsuits per judge

and at least one commercial case that was pending for 12 years) (Newman, J., sitting by

designation); Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr., 311 F.3d 488, 499

(2d. Cir. 2002) (rejecting State Department reports as "a basis for any conclusion that the courts

of Ukraine constitute an inadequate alternative forum"); El-Fadl v. Cent. Bank of Jordan, 75 F.3d

668, 678 (D.C. Cir. 1996) (State Department report expressing "concern about the impartiality"

of Jordanian courts did not suffice to make that forum inadequate); Aguinda v. Texaco, Inc., 142

F. Supp. 2d 534, 544 (S.D.N.Y. 2001), aff'd, 303 F.3d 470 (2d Cir. 2002) (finding State

Department reports containing "conclusory assertions as to the relative corruptibility or

incorruptibility of Ecuadorian courts, with scant references to specifics, evidence, or application

to the instant cases" to be of "little use"); see also Blanco v. Banco Indus. de Venez., S.A., 997

F.2d 974, 982 (2d Cir. 1993) (political unrest in a foreign jurisdiction did not render the forum

inadequate absent some showing that the unrest has had an adverse effect on the judicial system

there); Gonzalez v. P.T. Pelangi Niagra Mitra Int'l, 196 F. Supp. 2d 482, 487-88 (S.D. Tex.

2002) (plaintiffs' general accusations contained in "voluminous proof of corruption in the

Indonesian judiciary–including newspaper articles, statements by prominent Indonesian

politicians, the results of a survey conducted by the Partnership for Governance Reform in

Indonesia, a World Bank report and statements by the United States government" failed to render

Indonesia an inadequate forum).  Thus, the key issue here is whether Plaintiffs have adduced

sufficient evidence to establish that the Zango proceedings demonstrate the inadequacy of the

Nigerian forum.

   As noted, Ishola, the Zango plaintiffs' counsel does not contend that he dismissed

the action because of corruption or bias in favor of Pfizer.  Instead, he dismissed that action

because the Zango plaintiffs "waited endlessly" for a new judge to replace Judge Hobon.  (Ishola Aff. II ¶ 10.)  Indeed, even Plaintiffs' counsel concedes that "[i]t may be impossible to know with certainty what 'personal' reasons induced Justice Hobon to decline jurisdiction over the Zango case."  (Kusel Letter at 3-5; see also Tr. at 24 ("I can't stand before you saying I know completely what is going on in the Nigerian judiciary.").)  Thus, Plaintiffs cannot establish corruption and bias in the Zango proceedings.

Moreover, Plaintiffs have not submitted any evidence to show that the Nigerian judiciary would be biased against its own citizens in "the kind of controversy here at issue." Aguinda, 142 F. Supp. 2d at 545.  Indeed, Pfizer lost a case to Nigerian citizens in the Nigerian Federal High Court involving Viagra.  (Declaration of Steven Glickstein, dated June 14, 2004 ("Glickstein Decl.") Ex. 4: Decision in Pfizer Specialties Ltd. v. Chyzolo Pharmacy Ltd., Suit No. FHC/L/CS/99, dated Feb. 13, 2001.)  Most of Plaintiffs' submissions are "of little use" because "they largely consist[] (perhaps understandably) of broad, conclusory assertions as to the relative corruptibility or incorruptibility of the [Nigerian] courts, with scant reference to specifics, evidence, or application to the instant cases." Aguinda, 142 F. Supp. 2d at 544; see also Monegasque De Reassurances, 311 F.3d at 493 (generalized allegations of corruption are insufficient); S.C. Chimexim S.A. v. Velco Enters. Ltd., 36 F. Supp. 2d 206, 214-15 (S.D.N.Y. 1999) (finding that "general . . . assertions are not sufficient to create a genuine issue of fact that Romania's judicial system as a whole is devoid of impartiality or due process," despite evidence that Romanian courts were "far from perfect").

Indeed, Plaintiffs' only specific evidence concerning Pfizer's efforts to influence the judiciary comes from Ishola's affidavit and Dr. Walterspiel's declaration.  Based on "one witness, Kabiru, a nurse who was utilized by Pfizer for the tests," Ishola contends that bribes

were offered to Nigerian government officials to induce them to cooperate with Pfizer officials in the Kano treatment program.  (Ishola Aff. II ¶ 14.)  Because Ishola's information is hearsay and not based on his personal knowledge, this Court rejects it.  See Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) (holding that a court may "strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements"); see also Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Doe v. Nat'l Bd. of Podiatric Med. Exam'rs, No. 03 Civ. 4034 (RWS), 2004 WL 912599, at *4 (S.D.N.Y. Apr. 29, 2004) (holding that a court may decline to consider those portions of an affidavit not based on personal knowledge); Scott v. Reno, No. 97 Civ. 5203 (RPP), 1998 WL 249178, at *3 (S.D.N.Y. May 18, 1998).  In any event, Ishola does not contend that Kabiru's statement influenced Ishola's decision to dismiss the Zango action.  See Fed. R. Evid. 401-02.

Relying on Dr. Walterspiel's declaration, Plaintiffs contend that Pfizer engaged in "bribery of judicial or law enforcement officials."  (Kusel Letter at 4.)  However, Dr. Walterspiel does not state that Pfizer engaged in "bribery of judicial or law enforcement officials" and does not address the Zango proceedings.  Further, during the Kano treatment program in 1996, Dr. Walterspiel was "employed as a pediatric research physician at Pfizer's Groton, Connecticut facility," not in Nigeria.  (Walterspiel Decl. ¶ 1; see also Dunne Aff. ¶ 3 ("Dr. Walterspiel was not in Nigeria during the Kano treatment program," and, therefore, "has no first-hand knowledge of anything that happened in Nigeria.").)  Dr. Walterspiel's declaration makes it abundantly clear that his allegations of bribery are speculative and not based on personal knowledge.  For example, he states that he was present when Mary Hayden, secretary to Dr. Scott Hopkins, took a

phone call from "Mike Dunn [sic], M.D., one of the Pfizer employees treating children on the

trial in Kano."  (Walterspiel Decl. ¶ 3.)  While Dr. Walterspiel contends that Dr. Dunne was

"very concerned" and asked for cash to be sent to Kano to prevent him and other Pfizer

employees from being jailed (Walterspiel Decl. ¶ 4-5), Dr. Walterspiel was not a participant in

the telephone call.  Further, Hayden, the participant in the telephone call, squarely contradicts

Dr. Walterspiel's second-hand rendition of the conversation.  (Affirmation of Mary Hayden,

dated June 7, 2004 ("Hayden Aff.") ¶ 3 ("There was never a phone call that I participated in

where Dr. Hopkins, Dr. Dunne or anyone else on the call suggested that Pfizer had to send cash

to Kano in order to avoid any Pfizer employee being jailed."); see also Dunne Aff. ¶¶ 6-9.).

Given these infirmities, this Court cannot credit Dr. Walterspiel's version of events.  See Hester

v. Rich, No. 03 Civ. 5714 (DC), 2004 WL 1872296, at *8 n.7 (S.D.N.Y. Aug. 19, 2004)

(excluding statements based on speculation and hearsay); see also Howley v. Town of Stratford,

217 F.3d 141, 154-55 (2d Cir. 2000) (plaintiff's testimony that other co-workers told her of

certain harassing statements likely inadmissible to prove that the statements were actually made);

4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.04[5], at 702-57

(2d ed. 2001) ("Testimony based on guesswork, speculation, or conjecture is inadmissible.").

          To the extent Plaintiffs contend that delay in the Zango proceedings led them to

dismiss that action, this Court finds that that delay was only temporary.  Plaintiffs concede that

the Zango plaintiffs were not without options after Judge Hobon recused himself.  They could

have appealed Judge Hobon's "administrative transfer" of their suit to Court I.  (Ishola Aff. II ¶

12; Tr. at 5-6.)  The temporary delay inherent in this option does not render Nigeria inadequate

or compel denial of Pfizer's forum non conveniens motion.  See In re Union Carbide Corp. Gas

Plant Disaster, 634 F. Supp. 842, 848 (S.D.N.Y. 1986), aff'd as modified, 809 F.2d 195 (2d Cir.

1987) (dismissing for <u>forum non conveniens</u> despite "delays and backlog . . . in Indian courts" and widespread "postponements and high caseloads" due to the fact that "India has approximately one-tenth the number of judges, per citizen, as the United States"); <u>see also</u> <u>Leon</u>, 251 F.3d at 1314 (evidence of Ecuadorian justice system's lack of financial resources, ratio of 1,000 cases per judge and at least one commercial case pending for 12 years was insufficient to demonstrate inadequacy of forum); <u>Broadcasting Rights Int'l Corp. v. Societe du Tour de France</u>, 708 F. Supp. 83, 85 (S.D.N.Y. 1989) ("Delays in an alternative forum's judicial system are not sufficiently harmful of due process to prevent dismissal on the ground of <u>forum non conveniens</u>.").  Moreover, as this Court has noted, part of the delay in the <u>Zango</u> proceedings resulted from the <u>Zango</u> plaintiffs' or their counsel's failure to appear in court, their requests for adjournments and their litigation strategy.

An alternative forum will be held inadequate only in those "rare circumstances" where it is "so clearly . . . unsatisfactory that it is no remedy at all."  <u>Piper</u>, 454 U.S. at 254 & n.22.  Based on the foregoing, this Court concludes that Nigeria is an available alternative forum for this litigation.  <u>See</u> <u>United Bank for Afr., PLC v. Coker</u>, No. 94 Civ. 0655 (TPG), 2003 WL 22741575, at *4 (S.D.N.Y. Nov. 18, 2003) ("[T]here is no question that the Nigerian forum is adequate to litigate" claims); <u>see also</u> <u>Baker Marine Ltd. v. Chevron Ltd.</u>, 191 F.3d 194, 197 (2d Cir. 1999).[6]

---

[6]  Because this Court grants Pfizer's motion to dismiss for failure to state a claim under the ATS and on <u>forum non conveniens</u> ground, this Court need not address the alternate grounds for dismissal that Pfizer advances.

<u>CONCLUSION</u>

For the foregoing reasons, this Court grants Pfizer's motion to dismiss the

Complaint for failure to state a claim under the Alien Tort Statute.  Even if this Court had subject

matter jurisdiction, it would dismiss the action on <u>forum non conveniens</u> grounds for the reasons

stated in Part III.  This Court would condition dismissal on <u>forum non conveniens</u> grounds on the

following grounds:

> 1.  Defendant Pfizer consents to suit and acceptance of process in
> any suit plaintiffs file in Nigeria on the claims that are the subject
> of the instant suit;
>
> 2.  Defendant Pfizer waives any statute of limitations defense that
> may be available to it in Nigeria;
>
> 3.  Defendant Pfizer makes available for discovery and for trial, at
> its own expense, any documents, or witnesses, including retired
> employees, within Pfizer's control that are needed for a fair
> adjudication of the plaintiffs' claims; and
>
> 4. Defendant Pfizer will not act to prevent plaintiffs from returning
> to this Court if the Federal High Court in Nigeria declines to accept
> jurisdiction of this action, if it is filed in Nigeria within 60 days of
> the entry of this Order.

The Clerk of the Court is directed to mark this case closed.

Dated: August 9, 2005
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to*:

Elaine S. Kusel, Esq.
Milberg Weiss Bershad Hynes & Lerach
One Pennsylvania Ave.
New York, New York  10119
*Attorneys for Plaintiff*s

Steven Glickstein, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York  10022-3598
*Attorneys for Defendant*